## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHARLES WARRICK, Independent
Administrator of the Estate of ELLA
ODESSA WARRICK

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

Case No. 21-cv-06881

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action for negligence and wrongful death against the United States pursuant to the Federal Tort Claims Act ("FTCA"). For the reasons stated below, the United States' motion for partial summary judgment [56] is granted, and Plaintiff's motion for summary judgment [58] [60] [63] [64] [65] is denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made,

1

the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

When cross-motions for summary judgment are filed, "[t]he ordinary standards for summary judgment remain unchanged [and] we construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 Fed. Appx. 92, 95 (7th Cir. 2012).

2

## BACKGROUND

To avoid confusion, the Plaintiff, Charles Warrick as Independent Administrator of the Estate of Ella Odessa Warrick, will be referred to as the "Estate." The decedent, Ella Odessa Warrick, will be referred to as "Ms. Warrick." Defendant, the United States of America, will be referred to as the "Government."

### I.     Local Rule 56.1

The Court first addresses the Estate's failure to comply with Northern District of Illinois Local Rule 56.1. "Local Rule 56.1 statements serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019). The Seventh Circuit has "consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019) (quotation omitted). The Seventh Circuit "allow[s] strict enforcement of the local rule, recognizing that it is not the duty of the district court to scour the record in search of material factual disputes." *Id.* at 415 (quotation omitted).

"Local Rule 56.1 is designed to isolate the material facts and put them before the court in an orderly and concise manner." *Graney v. Hartford Fin. Services, Inc.*, No. 01 C 5869, 2002 WL 31248509, at *2 (N.D. Ill. Oct. 4, 2002). The Seventh Circuit has "frequently said that it is within the district court's discretion to strictly enforce local rules regarding summary judgment by accepting the movant's version of facts

as undisputed if the non-movant has failed to respond in the form required." *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014).

Rule 56.1 statements of material facts must consist of concise numbered paragraphs, not to exceed 80 numbered paragraphs, and each asserted fact must be supported by citation to the specific evidentiary material that supports it. LR 56.1(d). The Estate's statement of facts violates each of these requirements. The Estate's statement of facts consists of 77 numbered paragraphs, but many are lengthy statements of multiple discrete facts, and some contain numbered subparagraphs. *See e.g.*, [60] at ¶¶ 14, 31, 33, 45, 57. Additionally, many of the Estate's facts are not supported by the cited evidentiary material. *See e.g.*, [74] at ¶¶ 11, 13, 17, 18, 50, 63, 71.

The Estate's memorandum of law in support of its motion for summary judgment also violates Rule 56.1. "When addressing facts, the memorandum must cite directly to specific paragraphs in the LR 56.1 statements or responses." LR 56.1(g). The memorandum should not cite directly to the record. *Madaffari v. Metrocall Companies Group Policy GL, H-21163-0, Plan No. 501*, No. 02 C 4201, 2005 WL 1458071, at *1 (N.D. Ill. June 15, 2005). The Estate's brief repeatedly cites directly to the record and asserts facts not contained in its statement of facts. *See e.g.*, [63].

Finally, a response to a statement of facts must admit, dispute, or admit in part and dispute in part with specificity the asserted facts. LR 56.1(e)(2). A response may not assert legal arguments except to make an objection, and any argument that the objectionable material should not be considered should be included in the party's response or reply brief. *Id.* A response may not assert any new facts. *Id.* To dispute an asserted fact, specific evidentiary material that controverts the fact must be cited and

4

explained. LR 56.1(e)(3). The Estate's response to the Government's statement of facts repeatedly violates these rules. *See e.g.*, [76] at ¶¶ 13-18, 58, 59, 61, 65 (includes legal argument in response to facts); *id.* at ¶¶ 26, 35, 36, 42, 46, 50 (asserts additional facts in response to facts); *id.* at ¶ 57 (no citation or explanation to support denial of fact); *id.* at ¶¶ 58, 59, 61, 68 (fails to admit or dispute fact).

The Government argues that the Court should disregard the Estate's improperly asserted facts, [73] at 6, and strike the entirety of the Estate's response to the Government's statement of facts, [80] at 1-2. The Court has discretion to strictly enforce Rule 56.1 or accept the properly supported facts and responses despite violations. *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011). In its discretion, the Court declines to strike the entirety of the Estate's facts and responses to the Government's statement of facts. The Court will instead disregard facts that are unsupported by the record and responses that are unpersuasive. *See Oxford Bank & Tr. and Fifth Ave. Prop. Mgt. v. Village of La Grange*, 879 F. Supp. 2d 954, 960 (N.D. Ill. 2012).

## II.    Factual Background

The Court takes the following background facts from the Government's statement of facts [57-1] and statement of additional facts [73-1], and the Estate's properly supported statement of facts [60] and statement of additional facts [77]. The facts are undisputed unless otherwise noted.

### A. Ms. Warrick's Medical Care

Ms. Warrick, born in 1925, moved to Chicago, Illinois in 2018 to live with her son and daughter-in-law, Charles and Patricia Warrick. [60] at ¶ 5. On December 7, 2018, Ms. Warrick suffered a fall at home and went to the Jesse Brown Veterans

Affairs Medical Center ("JBVA") Emergency Department. *Id.* at ¶ 7, 9. On December 13, 2018, Ms. Warrick was admitted to the JBVA Community Living Center. [57-1] at ¶ 5. On December 19, 2018, nursing staff noted that Ms. Warrick had pressure ulcers, commonly known as bedsores, on her sacrum and both heels. *Id.* at ¶¶ 7-8; [60] at ¶ 18. On January 1, 2019, Ms. Warrick's sacral pressure ulcer was surgically debrided. *Id.* at ¶ 25. Debridement is a procedure that removes damaged, dead, or infected tissue. *See* https://www.mayoclinic.org/diseases-conditions/bed-sores/diagnosis-treatment/drc-20355899.

On July 22, 2019, upon her and her family's request, Ms. Warrick was transferred to the Tuscaloosa VA Medical Center in Tuscaloosa, Alabama, where Ms. Warrick had spent most of her life, for hospice care. [57-1] at ¶ 10; [60] at ¶ 29. Ms. Warrick's sacral and left heel pressure ulcers never healed. [60] at ¶ 29. Ms. Warrick passed away on August 5, 2019, at the Tuscaloosa VA Medical Center. *Id.* The causes of death listed on Ms. Warrick's death certificate were: (1) congestive heart failure; (2) cardiomyopathy; and (3) atrial fibrillation. [57-1] at ¶ 11. Ms. Warrick suffered from those conditions for over 20 years before she passed away. *Id.* No conditions were identified on her death certificate as other significant conditions contributing to death. *Id.*

### B. VA OIG Complaint and Investigation

Around January 10, 2019, Charles Warrick, Ms. Warrick's son, submitted a hotline complaint regarding his mother's care and pressure ulcer injuries to the VA Office of the Inspector General ("VA OIG"). [60] at ¶ 41. A responsibility of the VA

6

OIG is to improve quality and safety within Veteran Integrated Service Networks ("VISNs"). [73-1] at ¶ 70. The VA OIG hotline complaint process focuses on quality of care and does not accept tort claims or legal matters. *Id.* at ¶¶ 71, 73. Warrick's complaint prompted an investigation and report on the factors that contributed to Ms. Warrick developing pressure ulcers and whether JBVA nursing staff complied with the standard of care. [60] at ¶ 43.

Several drafts of the reports were exchanged between JBVA and the VISN and incorporated feedback and revisions. *Id.* at ¶¶ 42-50. The final report, dated May 6, 2019, stated that the allegation of the hotline complaint was "negligence," that a medical record review and care team meeting were completed, and the allegation was substantiated. [65-54] at 1-5. The report stated that Ms. Warrick's care involved a lack of thorough documentation of skin assessments, and that a consistent turning schedule was not always followed. *Id.* at 2. The report also stated that a large turnover in nursing staff and nurse leadership may have contributed to the lack of oversight to ensure appropriate nursing interventions for Ms. Warrick. *Id.* The report stated that Ms. Warrick may have benefitted from an earlier recommendation for a different specialty bed to reduce the risk of pressure ulcer development. *Id.* at ¶ 75. The report stated that "to improve our Facility-Wide Wound Care Program to ensure it has resources needed to appropriately provide wound care" approval had been given to hire two additional wound care practitioners and for nursing personnel to attend external formal training. *Id.* at 1. The report also stated that Ms. Warrick "refus[ed] the position changes and activities that were being encouraged for her care." *Id.* at 2.

The report stated that Ms. Warrick "had bladder and bowel incontinence which may have contributed to the skin injury." *Id.* at 3.

Deborah Barker, a coordinator of the investigation and a drafter of the report, testified that she agreed that JBVA nursing staff did not regularly comply with the standard of care related to documenting skin and wound assessments, and aspects of Ms. Warrick's care fell below the standard of care that was owed to her. [60] at ¶ 52-55, 59.

### C. The VA's Policies and Procedures for Hiring, Staffing, and Procurement of Medical Supplies

The Department of Veterans Affairs ("VA") includes the Veterans Health Administration ("VHA") and receives discretionary funding appropriated by Congress. *Id.* at ¶¶ 13-14. The VHA is organized into administrative regions called VISNs that allocate budgets for VHA medical centers including funding for employees and medical supplies. *Id.* at ¶¶ 15-17. VHA medical centers decide how to allocate funding for staffing and hiring. *Id.* at ¶ 18. VHA Directive 1351, concerning staffing methodology, states that the "VHA must have a flexible and adaptable methodology to relate staffing levels and staff mix to clinical outcomes, effectiveness and efficiency; and to determine long-range staff planning and budget projections" and that staffing decisions entail use of "professional judgment, critical thinking, and flexibility." *Id.* at ¶¶ 19-20. VHA Directive 1352 requires that each VHA medical facility have one inpatient certified wound care specialist on staff. *Id.* at ¶ 21. Suja Mathew was the wound care specialist at JBVA. *Id.* at ¶ 23.

VHA Directive 1761 states that "[i]t is VHA policy that VA medical facilities establish, operate, and maintain a [supply chain management] program that is effective, cost efficient, transparent, and responsive to customer requirements, and to continually identify ways to improve [supply chain management] performance in support of high-quality Veteran care." [57-1] at ¶ 31.

### D. Expert Testimony

The Estate and the Government each put forth opinions from two expert witnesses to provide opinions on the standard of care and causation.

### i. The Estate's Experts

### 1. Dr. Deborah Lekan

Dr. Lekan[1] is a board-certified Gerontological Nurse and former Continence Care Nurse. [65-60] at 2. Dr. Lekan states that her nursing experience and her expertise in nursing education, research, and clinic practice serve as the foundation for her opinion. *Id.* Dr. Lekan further states that her expertise in frailty in hospitalized older adults based on current evidence, her clinical experiences, and her own research also informs her opinions. *Id.* Dr. Lekan reviewed records including the VA OIG hotline complaint and report, VA and JBVA policies and procedures, progress notes and nurses' notes, skin and pressure injury health summaries, and surgical report. *Id.* at 1-2. Based on her review of the records, Dr. Lekan "concluded with a reasonable degree of nurse certainty that there were significant violations in the

---

[1] Dr. Lekan has a PhD and is therefore referred to as Dr., however she is not a medical doctor.

standard of nursing care with respect to the care that should have been provided to Mrs. Warrick." *Id.* at 2.

Dr. Lekan states that the "policies and procedures of the VA and JBVAMC outlined the actions that nurses needed to take to prevent pressure injuries in Mrs. Warrick." *Id.* at 4. Dr. Lekan states that JBVA nursing staff failed to follow policies and procedures to conduct and document timely and accurate assessments of skin and pressure injuries; failed to conduct and document assessments for factors that impacted Ms. Warrick's skin integrity; failed to follow policies and procedures for patient change in condition; failed to timely and effectively communicate with other nursing staff about changes in condition of the skin and pressure injuries; failed to timely and effectively address system issues; failed to ensure sufficient nurse staffing; and failed to ensure bedside nursing staff followed policies and procedures for skin assessment. *Id.* at 4-5.

### 2. Dr. Gregg Davis

Dr. Davis is a board-certified family physician licensed in Illinois. [65-62] at 1. He is currently the Chief Medical Officer of the Illinois Rural Community Care Organization and a staff physician at Community Health Partnership—Mendota. *Id.* Dr. Davis has 36 years of experience as an attending physician caring for hospitalized patients and 20 years of experience as an attending physician and medical director of skilled care, long-term care, and shelter care nursing facilities. *Id.* He has extensive clinical experience caring for elderly patients with impaired mobility and a high risk of developing pressure ulcers. *Id.* Dr. Davis reviewed records including progress notes

from JBVA, surgical reports, skin and pressure injury health summaries, deposition transcripts, Ms. Warrick's death certificate, and Dr. Lekan's expert report. *Id.* at 1-3. Dr. Davis states that his opinions are based on his review of the pertinent medical records, his education and training, his review of the medical literature, and his knowledge of the accepted medical care for the diagnoses, care, and treatment of the relevant conditions. *Id.* at 3.

Dr. Davis states that "the standard of care violations, as outlined in Dr. Lekan's report, compromised Ms. Warrick's blood supply to the skin, overlying her sacrum and bilateral heels, causing her to develop pressure ulcers." *Id.* at 5. Dr. Davis states that the breaches in the standard of care by JBVA staff, as discussed in Dr. Lekan's expert report, "were the direct and proximate causes or contributors to the formation and failure to heal Ms. Warrick's sacral and heel ulcers." *Id.* Dr. Davis further states that the "resulting pain from her ulcers contributed to her inability to participate in physical and occupational therapy, which led to progressive weakness," and that the "resulting weakness and ulcer formation contributed to her prolonged hospitalization, nursing home admission, severe pain, functional decline, disfigurement, and failure to return to independent living." *Id.* Dr. Davis states that "the physiological stress of her decubitus ulcers, immobility, and function decline contributed to her death." *Id.*

Dr. Davis testified that Ms. Warrick's "various issues, the decubitus ulcers, her immobility and functional decline" meant that Ms. Warrick was "less up and moving

11

around" and "more likely in that scenario to develop atelectasis, pneumonia, and fluid overload." [57-3] at 207 (Davis Dep. Tr. 198:7-13). Dr. Davis further testified:

> [Ms. Warrick] was utilizing the assets of her body to attempt to heal these, and the combination of all those events contributed to her death. I'm not saying that it caused her death, but it contributed to her death. It made her less capable of fighting off and compensating other chronic disease states.

*Id.* (Davis Dep. Tr. 198:14-20). Dr. Davis also testified that he agreed with the conditions listed on Ms. Warrick's death certificate:

> Q. Okay. And then the conditions listed there are congestive heart failure, cardiomyopathy and atrial fibrillation; is that right?
> A. Agreed.
> Q. And you're not providing an opinion that those are not causes of her death?
> A. No, I'm not. I would agree with that.

*Id.* (Davis Dep. Tr. 199:20-200:2).

### ii. The Government's Experts

#### 1. Dr. Kathleen Thimsen

Dr. Thimsen[2] is a registered nurse with 47 years of experience in patient care. [65-64] at 1. She was initially certified as a wound management specialist in 1980 and has been a forensic nursing specialist for the past 20 years. *Id.* Dr. Thimsen has consulted on over 25,000 patients in her clinical practice providing wound management services and consultations. *Id.* Dr. Thimsen's work in the wound management field has also included training and educating physicians, nurses, and other members of healthcare teams. *Id.* Dr. Thimsen has authored articles and textbook chapters related to wounds, pressure injuries, abuse, and neglect. *Id.* Dr.

---

[2] Dr. Thimsen has a Doctor of Nursing Practice (DNP) and is therefore referred to as Dr., however she is not a medical doctor.

Thimsen reviewed records including JBVA medical records, Tuscaloosa VA medical records, VA policies, Dr. Lekan's expert report, Dr. Davis's expert report, and deposition transcripts. *Id.* at 2-3. Dr. Thimsen based her opinions on her professional experience in wound care, management of at-risk patients, certifications, awareness of guidelines, and review of medical records and other materials. *Id.* at 1. Dr. Thimsen opines to a reasonable degree of medical certainty that "the care that Ms. Warrick received was within the standard of care." *Id.*

Dr. Thimsen states that JBVA nursing staff "provided interventions to reduce the risk of pressure injuries and their deterioration within the standard of care and based on the Braden Scale instrument." *Id.* at 7. She states that nursing staff used the Braden Scale to assess risk, implemented a pressure ulcer protocol, followed a turning schedule, provided heel protectors and used pillows to elevate Ms. Warrick's feet, and ordered a low air mattress. *Id.* at 7-9. According to Dr. Thimsen, these topical wound treatments were within the standard of care and were used in accordance with VA policies. *Id.* at 9. Dr. Thimsen also believes that the two-day turnaround for a wound consultation was within an acceptable time frame given the type of wound and mechanism of putting in a request for consultation. *Id.*

Dr. Thimsen states that the standard of care for turning is every two hours. *Id.* at 18. She opines that the "records and testimony reflect consistent turning and repositioning, when allowed by the patient." *Id.* Dr. Thimsen notes that "[a]t times, position changes could not be done because of the refusals of Ms. Warrick or her son." *Id.* at 19. She further notes that the records show nursing staff educated Ms. Warrick

13

and her son about the importance of repositioning, but that it was within the standard of care for nurses to not move a patient without permission. *Id.*

Dr. Thimsen states that nursing staff followed the standard of care by providing a low air loss mattress to Ms. Warrick following an assessment that Ms. Warrick's Braden score was in the moderate range. *Id.* at 19-20. Dr. Thimsen states that low air loss mattresses have been the standard of care for greater than 20 years. She disagrees with Dr. Lekan's opinion that a Clinitron bed is the appropriate standard of care, stating that such a device is not considered preventative and is reserved for extreme and severe cases. *Id.* at 20.

### 2. Dr. Robert Kelly.

Dr. Kelly is a licensed medical doctor who is board-certified in internal medicine and was board-certified in geriatric medicine from 2007 to 2016. [73-1] at ¶ 94. Dr. Kelly maintains a specialty in internal medicine, geriatric medicine, hospital medicine, and long-term care medicine. [65-66] at 2. Dr. Kelly is currently on medical staff at Texas Health Harris Methodist Hospital Fort Worth, Baylor Scott & White Medical Center Fort Worth, Texas Rehabilitation Hospital of Fort Worth, and Texas Health Resources-Texas Health Specialty Hospital. *Id.* at 2-3. He has also previously worked at hospice and long-term post-acute care facilities. *Id.* at 2. Dr. Kelly states he is familiar with the standard of care at facilities like JBVA, and that he works with nurses daily and directly assesses their work and care. *Id.* Dr. Kelly reviewed records including Ms. Warrick's medical records and death certificate, VA and JBVA policies, Dr. Lekan's and Dr. Davis's expert reports, and deposition transcripts. *Id.* at

14

1-3. Based on his review of the records and his experience, Dr. Kelly opined that JBVA staff acted within the appropriate standard of care at all times. *Id.* at 2, 10.

Dr. Kelly opines that Ms. Warrick's skin breakdown was caused by her preexisting underlying diseases and frailty, as well as the fall which led to her admission to JBVA. *Id.* at 11. According to Dr. Kelly, JBVA staff acted within the standard of care and Ms. Warrick's skin breakdown was unavoidable. *Id.* at 12. Dr. Kelly states that "[t]here are no examples of staff declining to give care" and notes that "[t]he only reductions in care were those made by Mrs. Warrick and her son" and that such refusals are "reasonable for a frail elderly woman at the end of her life suffering heart failure, frailty, dementia, and progression of neurocognitive illness." *Id.* at 16.

Dr. Kelly states that he disagrees with some of Dr. Lekan's opinions regarding the standard of care. *Id.* at 16. For example, Dr. Kelly disagrees that the standard of care for nurses includes ordering or proposing treatments for pain like neural blocks, spinal blocks, and patient-controlled analgesia, which Dr. Kelly states is the responsibility of doctors and not nurses. *Id.* at 16-17. Dr. Kelly also disagrees that a Clinitron mattress was not timely provided, and states that wound care and prevention treatment beyond what the JBVA nursing staff provided would not be part of the standard of care. *Id.*

Dr. Kelly also disagrees with some of Dr. Davis's opinions. Dr. Kelly criticizes Dr. Davis for beginning his analysis on December 8, 2018, the day after Ms. Warrick's fall. *Id.* at 20. Dr. Kelly states that beginning the analysis there overlooks Ms.

15

Warrick's years of degenerative disease, pain, heart failure, physical decline and frailty prior to her fall and hospitalization. *Id.* Dr. Kelly states that there is no scientific measure to the "assets of the body" term used by Dr. Davis. *Id.* at 22. Dr. Kelly opines that Ms. Warrick's pressure ulcers did not contribute to her death or the progression of her chronic underlying conditions, and the pressure ulcers were a sign of Ms. Warrick's terminal disease. *Id.* at 24.

### E. Claims and Cross Motions for Summary Judgment

The Estate brings this action for negligence and wrongful death pursuant to the Federal Tort Claims Act ("FTCA"). [57-1] at ¶ 1. The Estate alleges that Defendant, by and through its employees and agents, negligently:

(a) Failed to allocate sufficient resources to adequately staff the facility to provide appropriate care, treatment, and supervision when it knew or should have known that the facility was understaffed and unable to provide reasonable care including, but not limited to, providing adequate assistance with turning and repositioning, providing timely wound care consultations, and maintaining a sufficient number of appropriately trained wound treatment nurses, and other staff to assist in the prevention of patients developing pressure ulcers and having them deteriorate;

(b) Failed to allocate sufficient resources to provide necessary medical supplies including, but not limited to, pressure relieving devices, sufficient air loss mattresses, heel protectors, wound care dressings, incontinence pads/diapers, and other tools to prevent the development and deterioration of pressure ulcers;

(c) Failed to adequately hire trained registered nurses, licensed practical nurses, treatment nurses, and certified nursing assistants, and/or adequately train the same, to provide appropriate care and supervision to prevent pressure ulcers from developing, worsening, and becoming infected;

(d) Failed to ensure that the facility's policies and procedures were properly implemented and followed;

(e) Failed to appropriately assess Ms. Warrick's risk for the development and deterioration of pressure ulcers;

(f) Failed to develop an appropriate care plan to address Ms. Warrick's risk for the development and deterioration of pressure ulcers;

(g) Failed to implement an appropriate care plan to address Ms. Warrick's risk for the development and deterioration of pressure ulcers;

(h) Failed to provide Ms. Warrick with appropriate assistance with turning and repositioning and other interventions to help prevent her from developing pressure ulcers and having them deteriorate;

(i) Failed to timely provide Ms. Warrick with appropriate pressure relieving devices, including an appropriate low air loss mattress and heel protectors;

(j) Failed to timely inform Ms. Warrick, and her family, regarding changes in her health condition, including, but not limited to, the development of new skin breakdown and the deterioration of the same; and

(k) Failed to timely and appropriately document in Ms. Warrick's medical record details pertaining to her skin status, changes in condition, and more.

[1] at ¶ 30 (Counts I(a) – I(k)). The Estate also alleges that Defendant's negligent acts and/or omissions directly and proximately caused and/or contributed to Ms. Warrick's death. *Id.* at ¶ 41 (Count II).

The parties filed cross motions for summary judgment. The Government moves for summary judgment as to Counts I(a) – I(d) and Count II. [57]. The Government requests that the Court exclude the testimony of Dr. Davis as it relates to cause of death. *Id.* at 16. The Estate moves for summary judgment in the entirety. [58]. The Estate requests that the Court exclude the testimony of Dr. Thimsen entirely or specifically as it relates to causation, [63] at 11, exclude the testimony of Dr. Kelly as it relates to the standard of care and violations of the standard, *id.* at 12, and to exclude the testimony of both Dr. Thimsen and Dr. Kelly that is speculative, *id.* at

17

13. In addition to moving for summary judgment on all claims, the Estate also makes various prayers for relief, including that Defendant's experts be barred from testifying at trial; alternatively that only one of Defendant's experts be permitted to provide nursing, medical, and causation opinions, respectively; and that if the Court finds that the Estate has not met its burden of proof on any claims, that it be permitted to amend its pleading. [58] at 19-20; [75] at 19-20.

## ANALYSIS

### I. Admissibility of Expert Testimony

Both parties have challenged the admissibility of expert testimony. A party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). The Government argues that Dr. Davis's opinions on causation of death are inadmissible because they are unreliable and do not set forth any evidence of causation. [57] at 16. The Estate argues that Dr. Thimsen is not qualified to give opinions to a reasonable degree of medical certainty or give opinions on causation. [63] at 11. The Estate also argues that Dr. Kelly is not qualified to give opinions on the nursing standard of care. *Id.* at 12. Finally, the Estate argues that both Dr. Thimsen and Dr. Kelly gave speculative opinions that should be barred. *Id.* at 13.

Matters relating to the admissibility of scientific expert testimony are governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). *See Chapman v. Maytag Corp.*, 297 F.3d

682, 686 (7th Cir. 2002). A witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflect a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under the *Daubert* framework, the district court must engage in a three-step analysis before admitting expert testimony, determining whether (1) the witness is qualified; (2) the expert's methodology is scientifically reliable; and (3) the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). District courts have "broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000). The court "is expected to reject any subjective belief or speculation." *Ammons v. Aramark Unif. Services, Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (quoting *Chapman*, 297 F.3d at 687). The following non-exhaustive factors may be considered in determining reliability: (1) whether the scientific theory has been or can be tested; (2) whether the theory has been subjected to peer-review and/or academic publication; (3) whether the theory has a known rate of error; and (4) whether the theory is generally accepted in the relevant scientific community. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015). "Ultimately, reliability is determined on a

case-by-case basis." *Id.* (citing *Ervin v. Johnson & Johnson,* 492 F.3d 901, 904 (7th Cir.2007)).

### A. Dr. Davis

The Government does not challenge Dr. Davis's qualifications or reliability regarding his opinions on the Estate's medical malpractice claims. *See e.g.*, [57]. The Government also does not challenge Dr. Davis's qualifications to give an opinion on causation of death. *See id.* at 16-20. As discussed above, Dr. Davis is a board-certified family physician licensed in Illinois, has 36 years of experience as an attending physician caring for hospitalized patients, 20 years of experience as a medical director of long-term care facilities, and has clinical experience caring for elderly patients with high risk of developing pressure ulcers. *See* [65-62] at 1. The Court finds that Dr. Davis is qualified to opine on cause of death.

The Government objects to the reliability of Dr. Davis's opinions on the causation element of the Estate's wrongful death claim. [57] at 16-20. Dr. Davis's opinion is that the breaches in the standard of care by JBVA nurses caused Ms. Warrick's pressure ulcers to form, that her pressure ulcers led to progressive weakness, and that "the physiological stress of her decubitus ulcers, immobility, and function decline contributed to her death." [65-62] at 5. Dr. Davis expanded on his theory on causation of death during his deposition, testifying that Ms. Warrick was "utilizing the assets of her body to attempt to heal" which "made her less capable of fighting off and compensating other chronic disease states." [57-3] at 207. Dr. Davis also testified that he agreed with the causes of death listed on Ms. Warrick's death

certificate, that identified congestive heart failure, cardiomyopathy, and atrial fibrillation. *Id.*

Dr. Davis's report does not explain the bases for his opinions on causation of death. *See e.g.*, [65-62]. Dr. Davis does not provide an explanation as to how the sources he reviewed, including Ms. Warrick's medical records and death certificate, support his conclusions. *See id.* Dr. Davis's theory that Ms. Warrick was forced to utilize the "assets of her body" to heal is not found in his report. *Compare* [57-3] at 207 *with* [65-62]. Dr. Davis provides no definition for assets of the body, does not state whether assets of the body is a measurable or quantifiable concept, and gives no indication whether he measured or quantified Ms. Warrick's assets of the body, indicating that the theory is not one that can be tested. *See* [65-62]. The Government's expert, Dr. Kelly, states that he has never encountered the term "assets of her body" as a medical professional and asserts that "there is no scientific measure" of the term. [65-66] at 22. In his rebuttal report, Dr. Davis does not address Dr. Kelly's criticisms and offers no further explanation or support for his conclusions on causation of death. *See* [57-5]. Dr. Davis does not provide any citations to medical literature to support his theory, indicating that the theory has not been subject to peer review or publication, and may not be generally accepted in the medical community. *See* [65-62].

An expert's testimony on causation may be inadmissible where the opinion "amounts to speculation, subjective belief, or an idiosyncratic hypothesis that is not based on a recognized scientific method." *Ortega v. United States*, No. 16-CV-8402,

2021 WL 4477896, at *7 (N.D. Ill. Sept. 30, 2021) (internal quotes omitted) (citing *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019); *Porter v. Whitehall Lab'ys, Inc.*, 9 F.3d 607, 615 (7th Cir. 1993)). Dr. Davis's theory appears to be a personal hypothesis based on subjective belief, rather than a concept widely accepted in the medical community. *See Porter*, 9 F.3d at 615. The Court therefore finds that Dr. Davis's opinions on the cause of death to be not reliable.

The Court also finds that Dr. Davis's opinion on cause of death would not be helpful to the trier of fact. The Estate must prove proximate causation to succeed on its wrongful death claim. *See McComb v. Bugarin*, 20 F. Supp. 3d 676, 682 (N.D. Ill. 2014). Proximate cause encompasses two distinct requirements: cause in fact and legal cause. *Id.* For cause in fact, the court asks "whether the injury would have occurred absent the defendant's conduct." *Id.* Dr. Davis testified that Ms. Warrick's pressure ulcers did not cause, but instead contributed, to her death. *See* [57-3] at 207 ("I'm not saying that it caused her death, but it contributed to her death."). He also testified that he agreed with the causes of death listed on Ms. Warrick's death certificate, which did not include her pressure ulcers. *Id.* Dr. Davis's opinion does not support that the alleged negligence of JBVA nurses was the cause in fact of Ms. Warrick's death, therefore his opinion would not be helpful to the trier of fact to determine proximate causation for the Estate's wrongful death claim.

The Court grants the Government's request to exclude Dr. Davis's opinions regarding cause of death.

### B. The Government's Experts

### i. Dr. Thimsen

The Estate objects to Dr. Thimsen's report in its entirety on the basis that she stated her opinions were to a reasonable degree of "medical certainty" rather than "nursing certainty." [63] at 11. Alternatively, the Estate requests that Dr. Thimsen's opinions on causation be barred on the basis that Dr. Thimsen is not a physician and is therefore not qualified to opine on causation. *Id.*

The Court will not find Dr. Thimsen's entire report inadmissible on the basis that the Estate argues. Federal rules, not state law, govern the admissibility of expert evidence in FTCA suits. *Midland State Bank v. United States*, 634 F. Supp. 3d 498, 513 (N.D. Ill. 2022) (citing *Love v. United States*, 17 F.4th 753, 756 (7th Cir. 2021)). Federal Rule of Evidence 702 does not require an expert to state his or her opinions are to a reasonable degree of "medical certainty" or "nursing certainty." Fed. R. Evid. 702; *see Midland*, 634 F. Supp. 3d at 513. The proper analysis is for the Court to determine whether Dr. Thimsen's opinions are admissible under Rule 702 and *Daubert.*

First, the Court finds that Dr. Thimsen's opinions on the standard of care are admissible. Dr. Thimsen is a registered nurse with 47 years of experience in patient care, is certified as a wound management specialist, has consulted on over 25,000 patients, has authored articles and textbook chapters on the topic of wounds and pressure injuries, and provides training and education on wound management to physicians and nurses. [65-64] at 1. She is qualified to opine on the standard of care for JBVA nurses. Dr. Thimsen's opinions on the appropriate standard of care are also

23

reliable. Her opinions are based on her professional experience in wound care and management of patients, certifications, awareness of guidelines, and records she reviewed. [65-64] at 1. Dr. Thimsen explains how various treatments or interventions work and why they comprise the standard of care. For example, she states that the Braden Tool has been used globally since 1988 to assess risk of skin breakdown, *id.* at 7; heel protectors are used to reduce pressure, friction, and shear, *id.* at 9; low-air loss mattresses for pressure distribution are a basic prevention strategy and also used as a therapeutic strategy to promote healing, *id.* Dr. Thimsen's opinions are relevant and will be helpful to the trier of fact. Her opinions articulate what she believes the relevant standard of care was for JBVA nurses' treatment of Ms. Warrick, which is an essential element to the Estate's claims.

The Estate's reliance on *Johnson v. United States*, 65 F. Supp. 3d 595 (N.D. Ill. 2014) is misplaced. *See* [63] at 11. In *Johnson*, the court held that a nurse could not provide expert testimony on the standard of care that a *physician* should have followed. 65 F. Supp. 3d at 607 n.12 ("[T]he opinions are inadmissible because Nurse Fedorka is not a licensed physician, and therefore, she may not render opinions on the applicable standard of care for a physician."). Here, Dr. Thimsen is opining on the standard of care for *nurses*, which Dr. Thimsen is qualified for.

Next, the Court finds that Dr. Thimsen's opinions on causation are not admissible. Dr. Thimsen theorizes that Ms. Warrick's initial fall resulting in her hospitalization was the result of an "ischemic event" and that Ms. Warrick suffered from "deep tissue injuries" because of her fall. [65-64] at 10-11. Dr. Thimsen's opinion

is that Ms. Warrick's pressure ulcers were the result of her deep tissue injuries and were therefore "unavoidable." *Id.* Dr. Thimsen appears highly qualified to opine on the treatment and care of wounds and pressure injuries, but she is not qualified to give the causation opinion she offers here. Dr. Thimsen is not a medical doctor, and her opinion is a speculative diagnosis of the cause of Ms. Warrick's injuries. Dr. Thimsen theorizes that Ms. Warrick suffered from an "ischemic event." A transient ischemic attack is caused by a brief blockage of blood flow to the brain, similar to a stroke.[3] Dr. Thimsen connects the possibility of an ischemic event to Ms. Warrick's pre-existing cardiovascular issues and other co-morbidities. [65-64] at 11. These speculative inferences are outside of Dr. Thimsen's area of expertise as a nurse specializing in wound care.

The Court grants in part and denies in part the Estate's request to exclude Dr. Thimsen's opinions.

### ii. Dr. Kelly

The Estate objects to the admissibility of Dr. Kelly's opinions, arguing that he is not a nurse and therefore is not qualified to give opinions on the nursing standard of care. [63] at 12-13. Dr. Kelly is a licensed medical doctor, board-certified in internal medicine, has experience in hospice and long-term post-acute care facilities, and works with nurses daily to assess their work and care. [65-66] at 2. Dr. Kelly is qualified to provide opinions on the standard of care applicable to JBVA nurses. *See Love*, 17 F.4th at 756 (affirming admission of medical doctor testimony in FTCA

---

[3] *See* https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679.

negligence case against nurse and rejecting argument that "only a nurse practitioner may testify about whether that decision met the standard of care").

The Estate also objects to Dr. Kelly's opinion that Ms. Warrick's skin breakdown was unavoidable as speculative. [63] at 16-18. As discussed above, Dr. Kelly is qualified to provide an opinion on the cause of Ms. Warrick's injuries. Dr. Kelly states that Ms. Warrick's deconditioning was unavoidable and a natural progression of Ms. Warrick's aging and co-morbidities including heart disease, neurocognitive disorder, weakness, and advanced age. [65-66] at 10. He further opines that Ms. Warrick's skin breakdown was caused by her preexisting underlying diseases and frailty, as well as the initial fall that prompted her hospitalization. *Id.* at 11. Dr. Kelly details the various treatments and interventions performed by JBVA nursing staff and concludes that they were timely and met the standard of care. *Id.* at 11-12. He concludes that "[i]n such a setting, skin breakdown that develops is reasonable considered unavoidable." *Id.* at 12.

Dr. Kelly states his opinions are based on his education, experience, training, relevant medical literature, and review of records. His report is supported by ample citations to the medical records providing the basis for his opinions. The Court finds that Dr. Kelly's opinions on causation are reliable. They are also relevant because causation is an essential element of the Estate's claims. The Court denies the Estate's request to exclude Dr. Kelly's opinions.

## II.     Wrongful Death

The Estate alleges that Defendant's negligent acts or omissions caused Ms. Warrick to develop multiple pressure ulcers which "caused and/or contributed to cause her death." [1] at ¶ 41 (Count II). The Government moves for summary judgment on the wrongful death claim, arguing that the Estate "lacks admissible expert opinion to establish that any JBVA nurses breached a standard of care and that such breach proximately caused Warrick's death." [57] at 16. The Estate also moved for summary judgment on its wrongful death claim. *See* [63]. However, the Estate made no argument in support of its wrongful death claim, *see id.*, and in response to the Government's motion argued that there are genuine disputes of material fact that preclude summary judgment. *See* [75] at 17-19.

To prove a tort under the FTCA, a plaintiff must prove the elements "in accordance with the law of the place where the act or omission occurred." 28 U.S.C.A. § 1346(b)(1); *see also Midwest Knitting Mills, Inc. v. United States,* 950 F.2d 1295, 1297 (7th Cir.1991) ("the FTCA incorporates the substantive law of the state where the tortious act or omission occurred"). The acts or omissions of this case occurred in Illinois; therefore, the Court applies Illinois substantive law.

Under Illinois law, the Estate must prove: "(1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of duty proximately caused decedent's death; and pecuniary damages arising therefrom to persons designated under the Act." *Leavitt v. Farwell Tower Ltd. Partn.*, 625 N.E.2d 48, 52 (Ill. App. 1st Dist. 1993). "The element of proximate cause must be established by expert testimony, and the causal connection may not be 'contingent, speculative, or merely

possible.'" *Jefferson v. Mercy Hosp. & Med. Ctr.*, 97 N.E.3d 173, 181-82 (Ill. App. 1st Dist. 2018) (quoting *Townsend v. University of Chicago Hospitals*, 741 N.E.2d 1055 (Ill. App. 1st Dist. 2000)).

As discussed above, the Court finds that Dr. Davis's opinions on cause of death are not reliable and are therefore inadmissible. The Estate therefore has no expert testimony to establish causation, and summary judgment is granted in the Government's favor. *See Myers*, 629 F.3d at 645.

## III. Discretionary Function Exception

The FTCA provides a broad waiver of the United States' sovereign immunity and provides for a cause of action for tort claims "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C.A. § 1346(b)(1); *see Lipsey v. United States*, 879 F.3d 249, 253 (7th Cir. 2018). Congress has carved out several exceptions to the FTCA's broad waiver of sovereign immunity, including the "discretionary function exception" ("DFE") which applies to "[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C.A. § 2680(a); *see Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008). "The purpose of this discretionary-function exception is to 'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an

action in tort.'" *Reynolds*, 549 F.3d at 1112 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).

The DFE applies if the challenged government conduct meets two requirements: (1) the alleged conduct must involve an element of judgment or choice; and (2) the alleged conduct must amount to a permissible exercise of policy judgment. *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991); *Berkovitz v. United States,* 486 U.S. 531, 536 (1988)). Conduct cannot be discretionary, and therefore fails the first requirement, if a federal statute, regulation, or other policy specifically prescribes a course of action for an employee to follow. *Id.* (quoting *Berkovitz* 486 U.S. at 536). The government actor's intent is not relevant to the court's analysis of whether the discretionary function exception applies. *Id.* (citing *Palay v. United States*, 349 F.3d 418, 428 (7th Cir.2003)).

The Estate alleges that Defendant negligently failed to: (a) adequately staff the JBVA; (b) allocate sufficient medical supplies; and (c) adequately hire and train staff. [1] at ¶ 30(a)-(c) (Count I(a)-(c)). The Government argues that the DFE applies to these claims because there is no federal statute, regulation, or policy that specifically prescribes a course of action the VA must follow with respect to hiring, staffing, training, and allocation of medical supplies. [57] at 5.

### A. Medical Supplies

The Estate alleges that Defendant "[f]ailed to allocate sufficient resources to provide necessary medical supplies including … tools to prevent the development and deterioration of pressure ulcers." [1] at ¶ 30(b). The Estate makes no argument

against the DFE's applicability to allocation of sufficient medical supplies and does not cite any applicable statute, regulation, or policy that the VA must follow with respect to allocation of medical supplies. *See e.g.*, [57]. Separately, in response to the Government's argument for summary judgment on the Estate's wrongful death claim, the Estate clarifies "[f]or sake of efficiency" that it "does not intend to allege that JBMC lacked supplies or a certain amount of supplies." [57] at 13. While this assertion may evidence the Estate's intent to abandon its medical supplies claim, the Court also finds that the DFE applies to the VA's allocation of medical supplies in this case.

Neither party has identified any applicable statute, regulation, or policy that prescribes a course of action the VA must follow regarding allocating resources for medical supplies. Under VHA Directive 1761, the VA Secretary is directed to operate and maintain a supply chain program that is "effective, cost efficient, transparent, and responsive to customer requirements." [57-1] at ¶ 31. Therefore, the VA's actions in allocating resources for medical supplies involves discretion and satisfies the first requirement of the DFE test. The Court can also presume that decisions regarding medical supply allocation are grounded in policy, satisfying the second requirement of the DFE test. *See Gaubert*, 499 U.S. at 324 ("When established governmental policy … allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."). The Court therefore finds that the DFE applies to the JBVA's allocation of medical supplies. S*ee also Tolbert v. Gallup Indian Med. Ctr.*, 555 F. Supp. 3d 1133, 1172 (D.N.M. 2021)

("[A]bsent a mandatory regulation, the selection of an emergency room's equipment is precisely the sort of policy-based decision protected by the discretionary function exception."); *Dollins v. United States*, No. 15-21731-CIV, 2016 WL 398228, at *3 (S.D. Fla. Feb. 2, 2016) ("There are social and economic considerations the VA must evaluate when purchasing wheelchairs for veterans, including controlling limited resources and managing logistics. The discretionary function exception protects these types of decisions.").

### B. Staffing, Hiring, and Training

The Estate alleges that Defendant "[f]ailed to allocate sufficient resources to adequately staff the facility to provide appropriate care" including "maintaining a sufficient number of appropriately trained wound treatment nurses." [1] at ¶ 30(a). The Estate additionally alleges that Defendant "[f]ailed to adequately hire trained nurses … and/or adequately train the same." *Id.* at ¶ 30(c). The Government argues that there is no federal statute, regulation, or policy prescribing a course of action for the VA to follow with regard to staffing, hiring, or training, therefore the DFE applies. [57] at 5. The Estate argues that VHA Directive 1351 is a mandatory policy which required the JBVA to implement staffing plans, and that the JBVA failed to comply with this mandatory directive. [75] at 3-4; *see* [57-5] at 21-23. The Estate alternatively argues that the JBVA's alleged failure to adequately staff, hire, and train staff was a failure to implement safety measures, which cannot fall within the DFE. *Id.* at 12.

Numerous federal appellate courts have held that decisions relating to the hiring, training, and supervision of employees generally fall within the DFE. *See*

*Snyder v. United States*, 590 Fed. Appx. 505, 510 (6th Cir. 2014) (unpublished) (hiring and supervisory decisions fall within the discretionary function exception); *Guile v. United States*, 422 F.3d 221, 231 (5th Cir. 2005) (same); *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (same); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) (same); *Richman v. Straley*, 48 F.3d 1139, 1146-47 (10th Cir. 1995) (same); *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995) (same); *see also Moore v. United States*, No. 17 C 795, 2018 WL 1035872, at *5 n.4 (N.D. Ill. Feb. 22, 2018) ("[D]ecisions concerning the hiring, training, and retention of employees typically fall with the discretionary function exception.").

Specifically with regard to the VA, federal courts have found that the VA's conduct in hiring, training, retaining, and supervising employees falls within the DFE. *See Huff v. United States*, No. 18CV10344DDPKSX, 2020 WL 2510520, at *3 (C.D. Cal. Mar. 5, 2020) (holding that DFE applied to inadequate staffing, hiring, training, and supervision claims against VA); *Brown v. United States*, No. CV 17-1551, 2018 WL 741731, at *6 (E.D. Pa. Feb. 7, 2018), *aff'd*, 823 Fed. Appx. 97 (3d Cir. 2020) (unpublished) (holding that DFE applied to negligent hiring, retention, training, discipline, and supervision claims against VA); *Hooper v. United States*, No. 1:12-CV-00297-CL, 2013 WL 5530603, at *3 (D. Or. Sept. 25, 2013) (holding that lack of training, supervision, and instruction claims against VA fall within DFE and granting summary judgment).

However, the DFE does not categorically bar all negligent hiring, supervision, and retention claims. *See Lins v. United States*, 847 Fed. Appx. 159, 165 (4th Cir.

2021) (unpublished). Such claims should be analyzed according to the two-part *Gaubert* test. *Id.*

### i. The Challenged Conduct Was Discretionary in Nature

The Estate argues that VHA Directive 1351 prescribes a mandatory course of action for the JBVA to follow with regard to staffing, therefore the DFE is not applicable. [75] at 3. The Estate alleges that Directive 1351 makes the implementation of staffing plans a mandatory action which JBVA failed to perform in relation to the staffing of JBVA's wound care department. *Id.* at 4. The Estate concedes that Directive 1351 allows discretion in developing staffing plans but argues that implementation of a developed staffing plan is mandatory and nondiscretionary. *Id.* at 5.

The Estate's argument is unconvincing. Directive 1351 clearly provides the VA with discretion in relation to nurse staffing. The directive states that the VA "must have a flexible and adaptable methodology to relate staffing levels and staff mix to clinical outcomes, effectiveness, and efficiency." [57-5] at 4. It further states that "[s]taffing decisions require … professional judgment, critical thinking, and flexibility" and that "[s]taffing needs are individualized to specific clinical settings and cannot rely solely on ranges and fixed staffing models, staff-to-patient ratios, or prescribed patient formulas." *Id.* The Estate focuses on the language "[n]ext, implement the staffing plan" to argue that implementation is mandatory even if the development of staffing plans is discretionary. That language regarding implementation is step 15 in a 17-step flow chart detailing the staffing methodology.

*Id.* at 21-23. The subsequent steps are to "analyze and collect outcome measures" and "conduct[] on-going staffing analysis," which indicates that the staffing methodology is an iterative and ongoing process. *Id.* The Court therefore finds that Directive 1351 does not prescribe a course of action that VA employees must adhere to with regard to general nurse staffing.

Additionally, the Estate's theory assumes that an approved staffing plan existed to hire additional wound care specialists. *See e.g.*, [75] at 4-5. The Estate relies on the report developed in response to Charles Warrick's complaint to the VA OIG and deposition testimony from various JBVA staff members to argue that the JBVA had a plan to hire additional wound care specialists. *Id.* However, the Estate points to no evidence that such a plan was developed pursuant to the 17-step plan set out in VHA Directive 1351 that requires, among other things, collection and analysis of data, a review and approval process, including approvals from a Facility-Expert Panel, the Nurse Executive, and the Director. *See* [57-5] at 21-23.

Regarding wound care specialists specifically, VHA Directive 1352 requires that VA medical facilities have one inpatient certified wound care specialist on staff, and JBVA did have at least one such specialist, Suja Mathew, on staff during the relevant time period. [57-1] at ¶¶ 21-23. The Estate's allegations that JBVA failed to hire additional wound care specialists concerns conduct that has an element of judgment or choice. The Court therefore finds that the challenged conduct was discretionary.

ii. **The Challenged Conduct Was Policy-Based**

Decisions relating to the hiring, training, and supervision of employees are susceptible to policy judgment. Hiring decisions require consideration of a variety of factors including "budgetary constraints, public perception, economic conditions, 'individual backgrounds, office diversity, experience and employer intuition.'" *Burkhart*, 112 F.3d at 1217 (quoting *Tonelli*, 60 F.3d at 496). Supervision decisions involve "a complex balancing of budgetary considerations, employee privacy rights, and the need to ensure public safety" and training decisions involve "consideration of fiscal constraints, public safety, the complexity of the task involved, the degree of harm a wayward employee might cause, and the extent to which employees have deviated from accepted norms in the past." *Id.*

The Estate alternatively argues that, even if no mandatory directives apply, a failure to implement a plan, particularly when involving matters of safety, does not fall within the DFE [75] at 10. The Estate relies on *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005) to distinguish between discretionary design of a plan and mandatory implementation of a plan. *Id.* As a court in this district has noted, however, the Ninth Circuit's post-*Whisnant* precedent makes clear that the DFE still applies where "the implementation itself implicates policy concerns." *In Matter of Compl. of Ingram Barge Co.*, 194 F. Supp. 3d 766, 793-95 (N.D. Ill. 2016) (citing *Gonzalez v. United States*, 814 F.3d 1022, 1035 (9th Cir.2016)). And "so long as a decision involves even two competing policy interests, it is susceptible to policy analysis and is thus protected by the discretionary function exception." *Id.* (cleaned up) (quoting *Chadd v. United States*, 794 F.3d 1104, 1112 (9th Cir. 2015)). Therefore,

where a decision to implement a plan involves "balance[ing] competing policy interests," the DFE applies. *See id.* at 795.

JBVA's alleged failure to adequately hire and train employees is therefore the type of conduct that is susceptible to policy judgment. The implementation of hiring, supervision, and training decisions require the balancing of competing policy interests. The Court therefore finds that the DFE applies to the JBVA's conduct relating to staffing, hiring, and training.

Having found that the DFE applies and bars Counts I(a)-I(c), the Court declines to address the Government's separate argument that the Estate failed to establish negligence for Counts I(a)-I(c). The Court grants summary judgment in favor of the Government on Counts I(a)-I(c).

## IV. Medical Malpractice Claims

The Estate moves for summary judgment on its claims of negligence regarding the medical care Ms. Warrick received. [63] at 9. The Estate alleges that Defendant:

(e) Failed to appropriately assess Ms. Warrick's risk for the development and deterioration of pressure ulcers;

(f) Failed to develop an appropriate care plan to address Ms. Warrick's risk for the development and deterioration of pressure ulcers;

(g) Failed to implement an appropriate care plan to address Ms. Warrick's risk for the development and deterioration of pressure ulcers;

(h) Failed to provide Ms. Warrick with appropriate assistance with turning and repositioning and other interventions to help prevent her from developing pressure ulcers and having them deteriorate;

(i) Failed to timely provide Ms. Warrick with appropriate pressure relieving devices, including an appropriate low air loss mattress and heel protectors;

(j) Failed to timely inform Ms. Warrick, and her family, regarding changes in her health condition, including, but not limited to, the development of new skin breakdown and the deterioration of the same; and

(k) Failed to timely and appropriately document in Ms. Warrick's medical record details pertaining to her skin status, changes in condition, and more.

[63] at 8-9.

Under Illinois law, to succeed on its negligence medical malpractice claims, the Estate must prove: "(1) the proper standard of care against which the defendant's conduct is measured; (2) an unskilled or negligent failure to comply with the applicable standard; and (3) a resulting injury proximately caused by the defendants want of skill or care." *Petre v. Cardiovascular Consultants*, 871 N.E.2d 780, 790 (Ill. App. 1st Dist. 2007). "Unless the negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care." *Id.* Proximate cause must also "be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Johnson v. Loyola U. Med. Ctr.*, 893 N.E.2d 267, 272 (Ill. App. 1st Dist. 2008). "Whether or not the defendant's conduct proximately caused the plaintiff's injury ordinarily is a question for the finder of fact to decide; only rarely are the facts so clear that the court can resolve the issue as a matter of law." *Palay*, 349 F.3d at 432–33.

The Estate asserts that Defendant has admitted to various violations of the standard of care. [63] at 9-10. The Estate's assertion that Defendant has "admitted" negligence relies on the report issued by the VA OIG in response to Charles Warrick's

hotline complaint and deposition testimony from various JBVA employees. *Id.* The Estate appears to confuse judicial admissions and evidentiary admissions. "Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them." *Keller v. United States*, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995). Evidentiary admissions, on the other hand, "may be controverted or explained by the party." *Id.* Where a party admits an adverse fact during a deposition or when testifying at trial, it is generally treated solely as an evidentiary admission. *Id.* The admissions the Estate relies on, largely taken from deposition testimony, are not binding admissions on the Defendant and may be controverted or explained. They do not replace the Estate's burden to establish the standard of care through expert testimony.

As discussed above, the Court will allow the testimony of Dr. Thimsen and Dr. Kelly, as qualified and reliable experts, that JBVA nurses did not violate the standard of care and did not cause Ms. Warrick's pressure ulcers. The Estate will present expert testimony from Dr. Lekan and Dr. Davis that JBVA nurses violated the standard of care causing Ms. Warrick's pressure ulcers. It is not for this Court to make credibility determinations on the expert opinions on summary judgment. *Manjarrez v. Georgia-Pac. LLC*, No. 12 C 1257, 2013 WL 3754861, at *5 (N.D. Ill. July 16, 2013). This "battle of the experts" creates a genuine issue of material fact. *Chamberlain Grp., Inc. v. Lear Corp.*, 756 F.Supp.2d 938, 951 (N.D. Ill. 2010) ("It is indeed true that a 'battle of the experts' can preclude summary judgment"). Given the conflicting expert testimony, and drawing all reasonable inferences against the

moving party, the Court finds the issues of the standard of care and causation to be appropriately left to the trier of fact and denies summary judgment as to the medical malpractice claims.

## V.     Count I(d)

The Estate alleges that Defendant "[f]ailed to ensure that the facility's policies and procedures were properly implemented and followed." [1] at ¶ 30(d). The Government argues that to the extent this allegation attacks employee supervision, the DFE applies, and to the extent this allegation asserts a claim for institutional negligence, such a claim is not permitted under the FTCA. [57] at 10. In response, the Estate states that "as it relates to failures to follow and implement policies and procedures, Plaintiff does not intend to attack JBMC's supervision of employees' following and implementation of policies and procedures, but does criticize Defendant employees for failing to comply and follow policies and procedures." [75] at 13. According to the Estate then, the allegation asserts neither an employee supervision claim or an institutional negligence claim.[4]

The allegations in Count I(d) therefore appear to be duplicative of the Estate's other claims. To the extent that the Estate is alleging that Defendant employees

---

[4] In light of the Estate's clarification that Count I(d) is not a claim for institutional negligence, the Court does not need to resolve the Government's argument that the FTCA does not permit claims of institutional negligence. Some federal appellate courts have ruled that institutional negligence claims cannot be brought under the FTCA. See e.g., *Adams v. United States*, 420 F.3d 1049 (9th Cir. 2005); *Meier v. United States*, 310 Fed. App'x 976 (9th Cir. 2009). As a federal district court in this circuit recently observed, the Seventh Circuit has not expressly ruled on this issue. See *Crenshaw v. United States*, No. 17-2304, 2020 WL 5579180, at *12 (C.D. Ill. Mar. 24, 2020) (declining to find that institutional negligence claims under the FTCA are categorically unavailable in the Seventh Circuit and noting that the Seventh Circuit has implicitly recognized such a claim); *see also Buechel v. United States*, 746 F.3d 753, 763 (7th Cir. 2014) (vacating judgment in favor of United States where prisoner alleged under FTCA that "the prison was negligent in failing to quarantine infected inmates").

failed to follow policies and procedures relating to staffing, hiring, training, *see* [75] at 13-16, the allegations are duplicative of Counts I(a)-(c). As discussed above, the discretionary function exception applies to those counts and the Government's motion for summary judgment is granted. To the extent the Estate is alleging that Defendant employees' acts or omissions in treating Ms. Warrick failed to follow policies and procedures and violated the standard of care, *see* [75] at 16-17, the allegations are duplicative of Counts I(e)-(k). There are disputed issues of fact, and those claims will proceed to trial.

## VI. Plaintiff's Additional Prayers for Relief

Except for its request regarding Dr. Thimsen's causation opinions, the Estate's additional prayers for relief are denied. *See* [58] at 19-20; [75] at 19-20. As discussed above, the Court will not completely bar the Government's experts from testifying at trial; the Estate's motion for summary judgment is denied; Dr. Thimsen's causation opinions are inadmissible, but her standard of care opinions are admissible; and Dr. Kelly's opinions are admissible. The Estate's requests that the Government's experts be restricted or limited because their testimony would be "cumulative" is denied because it is underdeveloped and not supported by any cited authority. *See Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("[P]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived."). That said, the Court expects the Government will not waste the Court's trial time. The Estate's request for leave to amend its pleadings is denied because it is unsupported and untimely.

## CONCLUSION

For the stated reasons, the Government's motion for summary judgment [56] is granted. The Court grants summary judgment in favor of the Government on Counts I(a)-I(c) and Count II. Plaintiff's motion for summary judgment [58] [60] [63] [64] [65] is denied.

E N T E R:

Dated: November 26, 2024

_____
MARY M. ROWLAND
United States District Judge